Lloyd L. Dilworth, Plaintiff-Appellant, v. Georgette Messenger and David B. Shapiro, Executors of the Last Will and Testament of Elmer Messenger, Deceased, and M. C. Hilmer, Defendants-Appellees.

Gen. No. 53,479.

First District, Third Division.

March 5, 1970.

Rehearing denied April 2, 1970.

Myer H. Gladstone, of Chicago (Jacob Shamberg, of counsel), for appellant.

■■■■■■■■

Morgan, Halligan, Lanoff & Cook, of Chicago (Charles J. Morgan, Samuel M. Lanoff, and John A. Cook, of counsel), for appellees.

MR. JUSTICE McNAMARA delivered the opinion of the court.

Plaintiff, Lloyd Dilworth, brought this action for an accounting against the defendants, Elmer Messenger and M. C. Hilmer, alleging the breach of an oral contract dealing with the drilling of certain oil wells. Prior to trial, defendant Messenger died and the executors of his estate filed their appearance. At the close of all the evidence, the master in chancery found that the plaintiff had failed to prove the allegations of his complaint by a preponderance of the evidence. The chancellor adopted those findings and entered a decree dismissing plaintiff's complaint. Plaintiff appeals, contending that the decree was against the manifest weight of the evidence.

Plaintiff's complaint alleged that defendants were partners engaged in the business of developing oil properties; that about August 1, 1951, defendants orally agreed that they would assign undivided fractional interests in certain oil and gas wells to plaintiff; that they would proceed to drill these wells and would charge plaintiff the actual pro rata cost of drilling and equipping these wells, and that plaintiff would receive his proportionate share of the receipts. By virtue of this agreement, defendants became the agents of plaintiff and owed him a fiduciary duty. The complaint set forth the various transactions, alleging that in each case plaintiff paid a sum of money to defendants which they represented as his share of the drilling costs, and afterwards he paid additional sums for completing and equipping the wells. Plaintiff further alleged that the sums he paid were arbitrary and excessive, and exceeded the actual cost of drilling, completing and equipping the wells. He

252

charged that defendants failed to disclose the true costs, and also failed to inform him of certain rebates received from various contractors.

Defendants in their answer alleged that plaintiff was to pay a fixed sum for original equipment and completion of the wells, and in return was to receive his share of the revenues and salvage value of the equipment; that plaintiff knew that the fixed sum was an approximation, and never objected to statements of account mailed after each drilling; that the fixed cost included services rendered by defendants in obtaining the leases and for other expenses. Defendants denied that they owed plaintiff a fiduciary duty, and alleged that each drilling was a separate and distinct agreement.

Certain facts and aspects of the relationships between the parties were undisputed. Defendants, Elmer Messenger and M. C. Hilmer, were partners engaged in the business of producing oil and gas. They would obtain oil leases in the State of Oklahoma, and sell or assign fractional interests in the leases to various investors, at times retaining fractional interests for themselves. Thereafter, equipment would be purchased and installed, and drilling would commence. The initial costs were supported by the original fractional investments. If the drilling produced no oil, the result was what is known as a dry hole. If there was a dry hole, the equipment would be salvaged and sold, the proceeds being divided among the investors. If the well was successful, additional operating charges were incurred, and copies of the monthly operating charges were sent to investors, including plaintiff. Initial amounts paid by investors and additional charges for completion and equipment were made in round numbers. However, monthly operating expenses were itemized, and each investor was charged his share of these expenses. Records indicated that the actual costs for drilling and completing a well varied. In some instances they were more than the investments;

in others, they amounted to less. If a well continued to produce, an independent oil company would purchase the products, and the receipts of these transactions were credited to the investors according to their share. Plaintiff invested in some 64 wells between 1951 and 1959, 48 of which resulted in producing wells, and his total investment amounted to about $250,000.

The issue at trial was the determination of the nature of the transactions between the parties. Plaintiff contended that he was a joint venturer with defendants and was to share in the costs of drilling and completion in accordance with his fractional interests. Defendants contended that plaintiff purchased a fractional interest in each of the wells on the basis of a fixed price, with a supplemental fixed price for completion and equipment where oil was found.

Milton D. Rutherford testified for plaintiff that he had a conversation with Messenger in the spring of 1955 relating to the drilling of wells. Messenger stated the advantages of investing in these transactions and told him that he would get the same deal that plaintiff and the other investors were getting. Rutherford could obtain a fractional share of a lease and pay the actual costs of drilling, completion and equipment. Plaintiff was present, and verified that this was his arrangement. Rutherford subsequently invested in a number of wells. About 18 months later, in a conversation at which plaintiff and Messenger's wife were present, Rutherford asked Messenger why there was never a refund on his initial investments. Messenger explained that it always cost a little more, but that he himself absorbed the loss.

On cross-examination, Rutherford testified that he was being sued by the Messenger's estate for money allegedly owed and unpaid by him regarding the oil well transactions. He never asked for a refund with regard to the 34 wells in which he had invested.

Eugene F. Jewett, an attorney, testified for plaintiff that he had known Messenger since 1951 or 1952. In the spring of 1954, Messenger asked him if he would like to invest in an oil well, and stated that he would be billed on the same basis as plaintiff; that is, he would pay his share of the actual cost of drilling, completing and equipping the well. He subsequently invested in 23 wells.

On cross-examination, Jewett testified that generally, but not always, he would receive bills for the estimated cost before the drilling began, that drilling cost would be in round numbers; and that he would receive bills for completion and equipment charges before the well was completed and equipped. He never asked for or received a statement of actual drilling costs.

Herbert Ostrow, a certified public accountant, testified for plaintiff that in May 1960, at plaintiff's request, he asked Messenger for the records of the drilling transactions in which plaintiff was involved. Messenger replied that he would allow the inspection of the operating accounts, but not those dealing with drilling and completion.

At the close of plaintiff's case, defendants presented a motion for a decree in their favor. The master made provisional findings based solely upon plaintiff's evidence; he made a report that plaintiff had produced sufficient evidence and denied defendants' motion for a decree. The chancellor affirmed the master's report and ordered defendants to proceed with their defense.

Fred Perrin, defendants' bookkeeper, testified for the defense that he did the bookkeeping and accounting for defendants from 1955 to 1962. He took care of all the records which dealt with the drilling of various oil and gas wells. He was familiar with the accounts of plaintiff, Rutherford and Jewett. None of them were ever sent the actual cost of drilling, completion and

equipment. He never discussed the terms of his investment with plaintiff, and plaintiff never requested the actual costs. He did have a discussion with Rutherford in 1957 as to the terms of his investment. He took a division order for Rutherford to sign at his office, and was asked what the actual costs were. Perrin told him that the actual costs had nothing to do with the preset price on the statements.

On cross-examination, Perrin testified that, generally, when Messenger retained an interest in a venture, he would not pay the same share as the other investors. He would, however, pay any difference between actual costs and total investment.

M. C. Hilmer testified on his own behalf that he and Messenger were partners in various oil ventures from 1953 to 1955. After he withdrew from the partnership, he invested in some subsequent drilling operations. He had known plaintiff since about 1948. In August 1951, he, plaintiff and Messenger had a conversation about oil drilling. Messenger stated that he would sell $\frac{1}{16}$ interests for $2,000 in a well which he was going to drill. Both he and plaintiff bought interests that same evening. Hilmer never received any statements as to the actual costs of drilling the well. While Hilmer was in partnership with Messenger, plaintiff never asked for statements as to the actual costs of the wells.

Paul Stevens testified for the defense that he participated in 7 oil well investments with defendants. In 1955, in Oklahoma, he had a conversation with plaintiff and Messenger. Plaintiff said that he was leaving for Florida, that he did not want to be left out of the next few wells, and also inquired about the investment terms. Messenger stated that it would be on the same basis as in the past, about $2,000 for drilling and $2,500 for completion. Messenger explained that this was so because he had to stay down there and look after the wells and pick up the leases. Plaintiff asked

Stevens whether he was satisfied with this arrangement, and he replied that he was.

Georgette Messenger, Messenger's wife, testified for the defense that she kept the books and sent out all the bills on oil wells. Plaintiff never asked her for the actual drilling costs. She was present at two conversations between her husband and Rutherford in 1958 and 1959. At both conversations her husband asked Rutherford when he was going to pay the money he owed in regard to certain oil transactions.

Harry Bernfield, a certified public accountant, testified that he had done accounting work for Messenger since 1935. He had a conversation with Jewett and Messenger in February, 1956. Jewett indicated that he contemplated buying shares in some wells at a fixed price and wished to know the tax consequences. He was told that drilling and completion charges could be written off as intangible costs.

Rutherford testified for plaintiff in rebuttal that he did not know Fred Perrin, that he had never met him, and that Perrin had never been in his office for the purpose of giving him division orders. He usually received his division orders by mail from an attorney in Oklahoma; he took them home, had his wife sign them and then returned them.

Plaintiff testified in rebuttal that he knew Messenger for 30 years. He denied having a conversation with defendants in August, 1951, concerning the drilling of oil wells. He testified that he met Stevens in 1954, and that both defendants were present. He denied stating that he was going to Florida and that he did not want to be left out of the next few wells. He did not ask Stevens about his arrangement, or whether he was happy with it.

At the close of all the evidence, the master made a final report, and concluded that plaintiff had failed to prove the allegations of his complaint by a preponderance of the evidence. He found that the various investors, in-

cluding plaintiff, were to pay a fixed sum for the drilling and completion of the wells, rather than their actual pro rata share of the costs of drilling and completion. He also found that defendants did not owe plaintiff a fiduciary duty until oil production had commenced after completion of the well. The master further found that, since all of the witnesses, except Mrs. Messenger, were contradicted by other testimony, and since the various conversations took place up to ten years previously, a consideration of the documentary evidence was necessary. The master recommended that the complaint be dismissed for want of equity. The chancellor entered a decree approving and affirming the master's final report, and dismissed plaintiff's complaint.

On this appeal, plaintiff contends that the findings of the master in chancery and the decree dismissing the complaint for want of equity were against the manifest weight of evidence. It is well accepted that a master's findings when approved by the chancellor will be disturbed only if they are manifestly against the weight of evidence. Ideal Trading Corp. v. 237 E. Ontario Corp., 82 Ill App2d 160, 227 NE2d 150 (1967).

At the outset, it must be noted that the master was not bound by the findings of fact which he made in his initial report at the conclusion of plaintiff's case. At that time, defendants moved for a decree in their favor. In the light of the legal issue presented and the evidence then before the master, he made certain findings of fact which he emphasized were provisional. It is clear that the preliminary report was issued for a limited purpose only, and that was to determine whether the evidence then presented, when viewed in a light most favorable to plaintiff, set forth a prima facie case. That provisional report was in no way binding upon the issue presented and the findings made at the close of all the evidence. Since the issue on appeal is whether the final report of the master approved by the chancellor was

against the manifest weight of evidence, we will not materially consider the preliminary report.

In urging that the findings and decree were against the manifest weight of evidence, plaintiff in effect argues that the testimony of his witnesses was credible and that of defendants' witnesses was unbelievable. He maintains that as a matter of law the testimony of Rutherford and Jewett was credible and that the testimony of Perrin, Bernfield and Stevens was false and unworthy of belief. The master found that the testimony of the various witnesses was irreconcilable and contradictory in certain respects, that there were inconsistencies in their testimony, and that it was impossible to determine their relative credibility. We see no reason to disturb those findings.

With regard to those factual disputes, Perrin testified for the defense that in 1957, when he took a division order to his office, Rutherford inquired about the actual costs of drilling the well, thus indicating that Rutherford considered his investments to be on a fixed basis, and also contradicting his testimony that he was to pay only his share of the actual costs. Plaintiff urges that Rutherford's testimony was more credible because he testified that he received the division orders by mail from an Oklahoma attorney, and had his wife, a joint owner, also sign them. However, the testimony of both witnesses was partially supported by documentary evidence. Plaintiff had introduced a letter from Perrin to Rutherford asking him to sign a division order. Consequently, the master was fully justified in refusing to find either witness more credible than the other. Nor did the failure of defendants to call the Oklahoma attorney as a witness create an inference, as plaintiff charges, that his testimony would be adverse to defendants. Defendants had presented Perrin's testimony plus documents supporting that testimony, and had no duty to present additional testimony. Moreover, the mas-

259

ter properly rejected plaintiff's offer of proof that Perrin was biased in favor of defendants because the executors of Messenger's estate had sold certain real estate to Perrin, which he in turn had sold at a profit. A profit at the expense of defendants would not indicate bias on the part of the witness in their favor.

The testimony of Jewett and Bernfield was also contradictory in some respects. Jewett testified for plaintiff that he was told by Messenger that his investment would be on the same basis as plaintiff, that he would be billed his share of the cost of drilling and completion. Bernfield testified for defendant that Jewett told him that he contemplated investments in oil drillings at a fixed price. The master found that both witnesses were credible, and he did not abuse his discretion in refusing to resolve the conflict in testimony. Plaintiff urges that Bernfield's testimony was incredible, arguing that the conversation between Jewett and Bernfield could not have taken place because Jewett had already invested in some wells at the time of the conversation. However, this fact does not indicate that the conversation did not take place. Even after making investments, there would be many reasonable explanations as to why Jewett should talk to an accountant and tax expert in the oil field. We find no merit in plaintiff's contention that Stevens' testimony was false and should have been disregarded. While he misstated the exact amounts previously invested, the substance of his testimony, supported by Hilmer, was that plaintiff was aware that his investment was on a fixed basis rather than on actual costs.

Moreover, as noted by the master, the documentary evidence supported defendants' contention that plaintiff's investments were on a fixed basis. Drilling and completion expense bills were sent to all investors, including plaintiff. These bills contained the legal de-

scription of the land in question and the amount owed by the investor "for [his] interest in the drilling" of the well. These bills ordinarily were sent before the actual drilling was commenced. None of these bills indicated that they were conditional or subject to change after the drilling; rather they reflected that these transactions were sales of fractional interests for fixed sums. Nor were there any charges on the bills for obtaining the leases or for any of the other services performed by defendant. The assumption necessary to plaintiff's argument, that defendant provided these services without consideration seems unreasonable. And in view of the course of these dealings, plaintiff's contention that he thought these bills represented his pro rata share of actual costs is unrealistic. Additionally, plaintiff's income tax returns for three years provided corroboration of defendants' position. Each year plaintiff deducted the amounts he had invested in the various oil wells with defendants. If he believed that he was to pay his share of the actual costs, it would have been necessary for him to obtain a partnership statement from defendants and then indicate his share of the actual costs on his tax returns.

Plaintiff paid round sums for drilling to defendants for a period of ten years. He was never offered an adjustment or information as to the actual costs, and he never requested such information in writing until 1960. The inference from the course of conduct between the parties that plaintiff knew that he was not being billed for his pro rata share of the actual expenses is almost inescapable. The final report of the master and the ensuing decree are amply supported by the evidence.

█ Plaintiff also argues that the master erred in finding that the relationship between the parties became fiduciary only when oil production commenced after completion of the well. Up to that time, the master deter-

261

mined that the parties would be merely tenants in common, that there would be no duty on plaintiff to make additional monetary contributions, and that he would not be liable to creditors for debts incurred by defendants in the course of drilling. That finding is also supported by the record.

In Dunbar v. Olson, 349 Ill App 308, 110 NE2d 664 (1953), the court stated at p 312:

"Before a mining partnership exists it must be shown not only that there is a joint ownership of the property, but also a joint working and a joint operation of the lease involved, which must be shown by competent evidence (citation omitted). By joint operation is obviously meant that each of the joint owners must have some choice and participation in control and management."

We believe that the above language is most appropriate in setting forth the requisites of a partnership under the facts of the instant case. Prior to oil production, plaintiff's only function was the investment of money at a fixed price. He did not participate in the control and management of the operation; he had no liability to third parties; he was not obliged to make up any drilling deficit; and he had nothing to do with the acquisition or leasing of any of the drilling sites. Until oil production was commenced, there was no fiduciary relationship between the parties, and consequently, no duty on the part of defendants to make a full disclosure to plaintiff of all material facts.

The decree of the Circuit Court is affirmed.

Decree affirmed.

DEMPSEY, P. J. and SCHWARTZ, J., concur.